EDGAR *v.* EDGAR.

1. DIVORCE—SUPREME COURT—TRIAL COURT'S OBSERVATION OF PARTIES AND WITNESSES.

   The Supreme Court gives much consideration to the advantage which the trial court has in a divorce case of the opportunity to see and hear the parties and their witnesses.

2. APPEAL AND ERROR—CHANCERY CASES—DE NOVO HEARING BY SUPREME COURT.

   The Supreme Court hears chancery cases *de novo* and is not bound by the conclusions reached by the trial court.

3. DIVORCE—EXTREME CRUELTY—EVIDENCE.

   In husband's suit for divorce, evidence *held,* to establish that defendant wife had been guilty of extreme and repeated cruelty.

4. SAME—DECREE IN SUPREME COURT—REMARRIAGE—INTERLOCUTORY RELIEF.

   Where decree of divorce is granted plaintiff husband on reversal of trial court's decree dismissing bill, decree is ordered to contain a provision that it shall not become final until six months after entry during which time neither party may remarry and also continuing provisions heretofore made for temporary alimony or support, custody of children, attorney fees and injunctive or other interlocutory relief until final decree is entered or decree becomes final under Court Rule (Court Rule No. 51, § 6 [c], as adopted October 13, 1947).

5. SAME—DECREE IN SUPREME COURT—REMAND FOR FURTHER TESTIMONY.

   Where record in divorce case, in which trial court dismissed bill for divorce and cross bill for separate maintenance, is barren of sufficient testimony as to property of the parties,

---

REFERENCES FOR POINTS IN HEADNOTES

[2] 2 Am. Jur., Appeal and Error, § 2; 3 Am. Jur., Appeal and Error, § 815.

the necessities of defendant wife and minor children and the net earnings or income of plaintiff to afford the Supreme Court a proper basis for determining property settlement, alimony, or custody of the minor children, case is remanded for taking of further testimony in order to provide for such matters and for enforcement of temporary injunction in the discretion of the trial court.

C. Same—Costs.
No costs in Supreme Court are awarded plaintiff husband who is granted a decree of divorce on appeal from order dismissing his bill.

Appeal from Wayne; Callender (Sherman D.), J. Submitted October 7, 1948. (Docket No. 42, Calendar No. 43,947.) Decided December 17, 1948.

Bill by Irving I. Edgar against Claire A. Edgar for divorce on ground of extreme and repeated cruelty. Cross bill by defendant against plaintiff for separate maintenance. Decree dismissing both bill and cross bill. Plaintiff appeals. Reversed, decree entered for plaintiff and cause remanded for further proceedings.

*Reuben Glazer* (*Louis Rosenzweig,* of counsel), for plaintiff.

Boyles, J. This is a bill for divorce, with cross bill for separate maintenance. Plaintiff and defendant were married in 1926, at which time the plaintiff, a physician-psychiatrist, was an intern at Grace hospital in Detroit. Three children were born of the marriage—Joyce, now about 19, David, about 17, and Richard, about 13. The parties lived together until January, 1947, and on January 7, 1947, the plaintiff filed a bill for divorce on the ground of extreme and repeated cruelty. Contemporaneously with the filing of the bill of complaint a temporary injunction was issued by the court restraining the defendant

from interfering with plaintiff's practice, coming into his office, or interfering with his use of his personal automobile. On January 23d, on plaintiff's petition, an order was issued requiring the defendant to show cause why she should not be cited for contempt of court for violating the injunction. The defendant was found guilty of contempt of court, and placed on probation. A similar petition filed in this Court after the appeal was perfected awaits outcome of the appeal. On January 25th the defendant filed an answer to the bill of complaint, and asked for dismissal of the case. From then on until the case was finally brought on for hearing on the merits on October 7, 1947, the case progressed through the filing of some 10 or 12 motions and petitions to dissolve injunction, for alimony and attorney fees, for orders to show cause, for rehearings, to advance cause for hearing, to modify injunction, to re-refer cause to presiding judge, to refer to the friend of the court, for substitution of attorneys, for leave to file cross bill. During this period, plaintiff was ordered to move from their residence; defendant's original attorney was authorized to withdraw from the case; order for temporary alimony, custody, and attorney fees was entered; the injunction was modified; reference to friend of the court granted; and other motions denied. Three days before hearing on the merits was begun, October 7, 1947, defendant's cross bill and an answer thereto were filed by leave of court, over plaintiff's objection. The defendant, by said cross bill, sought a decree of separate maintenance pursuant to 3 Comp. Laws 1929, § 12794 (Stat. Ann. § 25.211). The defendant also asked for custody of the minor children, temporary alimony, attorney fees and costs, and an injunction restraining the plaintiff (cross-defendant) from selling, concealing or giving away any of his property. We refer to the multiplicity of the aforesaid interlocutory mat-

ters, and other similar situations which have arisen in this Court, as the background which confuses any attempt to reach a conclusion as to the real merits of the case.

Hearing on the merits was begun October 7th, and during the taking of over 250 record pages of testimony the plaintiff's proofs fairly established the following facts:

The defendant was quarrelsome and nagging, on several occasions struck and scratched the plaintiff leaving permanent scars on his arms and wrists, on occasions locked him out of his room, interfered with his practice as a physician, accused him of intimacies with his patients, made like accusations to plaintiff's friends and other physicians, said that she would wreck the plaintiff professionally and ruin him socially, continually quarreled about money, on occasions left home for extended periods without explanation or reason. Much testimony was taken concerning the defendant's interfering with plaintiff's practice of his profession, and more particularly the defendant's allegations in her cross bill that the plaintiff was guilty of misconduct with patients and other women. In that regard, considerable reference was made in the testimony concerning an alleged love affair between the plaintiff and one Madam X, later identified by name as one Mrs. Schmidt.

The circuit judge saw and heard the parties and their many witnesses. We have often said that the Court gives much consideration to the advantage which such an opportunity affords to the trial judge. When both parties had rested their case, the trial judge expressed his view of the testimony as follows:

"Upon the record as it now stands, the court is prepared to indicate that there have been no proofs which sustain the cross bill for a decree of separate

maintenance, and the only real contest is whether, in equity, the plaintiff has made out sufficient proofs of extreme and repeated cruelty which would require that this court grant a decree. That the plaintiff has made out proofs of cruelty, I think there can be very little ground for saying that he has not made out what would, in the absence of contradiction of some of his acts, constitute a sufficient record upon which the court might grant a decree of divorce.

"This is a court of equity. The testimony as to the doctor's relations to one witness, Mrs. Schmidt, is in direct conflict. Neither party has seen fit to bring Mrs. Schmidt as a witness in this case. My present feeling is that to determine whether I will exercise the discretion that I have to grant a decree of divorce to the plaintiff on this bill of complaint, in the absence of the testimony of Mrs. Schmidt—I will say, that I cannot, at the present time, indicate that I will grant such a decree in the absence of the testimony of the woman that the defendant claims her husband was in love with, and has brought in— * * * what the defendant testifies to, that there was illicit actions by and between the Doctor and Mrs. Schmidt. The doctor testifies positively that there was not. If Mrs. Schmidt is brought here and corroborates his testimony, it will go quite a long ways in determining whether or not he, as complainant, is in court with clean hands sufficiently that he may be given a divorce in spite of that proof relative to his claimed relations with this woman. What she would say about it, under oath, would have considerable weight with me as to whether there is any truth in this claim that he was in love with, and had illicit relations with that woman. I have heard enough in this case to indicate now, upon the record, that there will not be any decree for the defendant and cross-plaintiff on her cross bill for separate maintenance. * * *

"These people have a nice family of three children, and in view of the failure of the people to agree upon a property settlement, I am very much in doubt as to whether there are sufficient equities in this case to

warrant the granting of the relief in plaintiff's bill of complaint, or in the cross bill of the defendant. There has been cruelty proven on the part of the respondent—repeated cruelty established. To review all of the proofs would require considerable time. I think the testimony of Mrs. Schmidt could be an aid to the court in determining whether or not there is sufficient cruelty proven to warrant the court in granting a decree to the plaintiff on the bill of complaint. I will take the case under advisement until one or the other of the parties indicate to me that they will arrange to bring Mrs. Schmidt here to testify."

Thereafter Mrs. Schmidt was produced in court and her testimony is in the record at length. She fully confirms plaintiff's allegation that the defendant seriously interfered with plaintiff in the practice of his profession. We are also in accord with the following conclusion announced by the trial judge and dictated on the record:

"*The Court:* I believe that the record will show that this witness which has been produced here this morning, Helen Schmidt, was produced because of the claim on the part of the defendant's counsel in his argument that the plaintiff's counsel hadn't brought this witness, and asking this court to give consideration to that fact, and, in view of that fact, the court suggested that he would hear the witness if the plaintiff's counsel desired to bring her in. He has brought her in and she has testified. The object of her being brought in was the issue brought up in the argument as to whether there was any equity on either side in this case which would permit this court to grant relief. This young lady's testimony impresses me as being honestly given, and emphasizes very much the conclusion to which I had already arrived, that there is no equity in the cross bill— nothing whatever that appeals to this court to grant a decree to the defendant for separate maintenance. The only question in my mind at the time the case

was concluded was whether there was sufficient evidence to warrant the court in recognizing an equity in the plaintiff sufficient to lead this court to grant a decree of divorce to him on the ground of cruelty. * * * —I believe her statements, absolutely, as to what Mrs. Edgar said on that occasion in the doctor's office. I don't believe there is any basis for claiming that there was any illicit or improper conduct of the Doctor in his relations with this witness that has testified this morning. He has impressed me as being truthful in his statements with reference to what occurred on that date. Mrs. Edgar's testimony as to what she heard and what was said on the occasion in the Doctor's office—it doesn't impress me as being truthful. * * * There is no ground for any decree of separate maintenance."

The court entered a decree dismissing both the bill of complaint and the cross bill and the plaintiff appeals. The defendant has not filed a brief in this Court. The sole question here for decision as stated by appellant is as follows:

"Did the plaintiff establish such extreme and repeated cruelty on the part of the defendant as to entitle him to a decree of divorce?"

There was testimony that the defendant falsely accused plaintiff of improper conduct with other women; that she called him a misfit, a rat, and a homosexual rat, in the presence of his family and children; that on several occasions she physically assaulted the plaintiff; that she repeatedly came to his office and interfered with his appointments; that she frequently flew into a rage, spit on the plaintiff, tore papers out of his hands, locked him out of his room, on several occasions told plaintiff she hated him, told their children he was a bad father, a psychopath and a rat, a dog, and a fool; that she did not take care of the home, left the bedroom littered with papers, magazines, cigarette butts, with dust all over

the place. There was testimony that she came to his office, interfered with his work, talking loud, starting quarrels. Plaintiff's sister testified:

"I live on Grand avenue. Dr. Edgar is my brother. I have known Mrs. Edgar for about 23 years. I know of some of the matters involved in their domestic difficulties. The doctor visits my home. Since my mother's death, we have been meeting at my home one night a week. The whole family congregates at my home, except one brother who lives out of town. * * *

"About March, 1945, Dr. Edgar came to my house to spend the evening. Mrs. Edgar came in about two hours later. She dashed in in a rage and she started to belittle him in front of all the members of the family. She said, 'You good-for-nothing.' She called us all names. She called him a 'misfit,' then she made fun of us because we came from a little town, when she herself came from a little town. She said that Dr. Edgar was no good, he was a rotten father and a rotten husband, that he spent his time coming over to the family, sitting and playing cards instead of being home. Then she dashed away. She was there altogether about 20 minutes to a half hour. I recall the incident which occurred in November, 1946. Mrs. Edgar came to my home. All the members of the family were present. Mrs. Edgar dashed in. We were playing cards and she started the same thing, in a rage, and belittled him, started calling him names. Then she said, 'I ought to go over and slap every one of your faces.' She attempted to walk over to my sister to slap her face when my husband was getting hold of her to take her to the door. Then Dr. Edgar saw there was going to be trouble so he got hold of her and led her to the door. She hauled off and slapped him. * * * In November and March of 1946, Mrs. Edgar called my brother names in my presence at my home. Also, Mrs. Edgar called on the telephone repeatedly. Mrs. Edgar called my

brother a rat and a misfit, because that is her favorite expression."

Plaintiff's office secretary testified:

"I recall Mrs. Edgar coming into the office about October 15th. The Doctor was out that afternoon. Mrs. Edgar wanted to know where Dr. Edgar was and I told her he was taking the afternoon off. She wanted to know why he wasn't there earning a living for his family, like he ought to be. She didn't leave the office. She walked into the consultation room. I went into the consultation room to get an appointment book. Mrs. Edgar was going through his desk papers. She had the drawer of his desk open and was going through his papers. Mrs. Edgar came into the office for checks or money while patients were present. These instances occurred all through August, September, October, and November, 1946. On this occasion of October 15th, when Mrs. Edgar went through the Doctor's desk, Mrs. Edgar told me to get out of the room. She said I was only an office helper and that she would set me in my place. In the same month of October, 1946, Mrs. Edgar took the Doctor's appointment book away from me. She came in one morning and snatched the appointment book out of my hands. She looked at the names on the appointment book and pointed to one man's name and said, 'Those people are no good; they have mistresses, such kind of people.' I did not attempt to take the appointment book away from her. I let her have it. Mrs. Edgar called the day before Thanksgiving, 1946, and said, 'You tell the Doctor not to come out to his home.' She wanted him to leave her alone because if he comes there will be trouble. I gave this message to the Doctor. Mrs. Edgar did snatch the mail out of my hand. This was around the month of October, 1946. She looked the mail over and there wasn't anything she cared about.

"I recall Mrs. Edgar coming into the office and having quarrels with Dr. Edgar. There would be patients in the office at the time. One time in No-

vember, 1946, she came in to see the Doctor. He took her into the consultation room and I closed the door. I had a gentleman patient waiting in the reception room. She began talking in a very loud voice and screaming. The patient became very nervous and upset and asked me what was the trouble in there. Her voice was loud enough to be heard in the office. Mrs. Edgar came in one time when I had a woman patient and her sister. The Doctor and Mrs. Edgar were in the consultation room. You could hear Mrs. Edgar's voice. It was loud and screaming and crying. I know of 3 or 4 instances during October and November, 1946, when these quarrels took place in the office. I know the Doctor lost patients as a result of these quarrels. * * *

"I remember what happened on December 9, 1946. Mrs. Edgar came to the office between 10 and 11 that morning. Dr. Edgar was in the consultation room. He had just dismissed a patient. When Mrs. Edgar came through the door, she said, 'You can get your things and get out of here. I am taking over.' I didn't say anything. She went into the consultation room where Dr. Edgar was and said, "Irving, I want you to get rid of Mrs. Million, I am taking over here.' I didn't hear the Doctor say anything to her. Mrs. Edgar called my name and called to me, 'Mrs. Million, come in here.' I did not go into the consultation room. Mrs. Edgar stayed there and I went across the hall into the rest room. I stayed there about 20 minutes, then I came back in the office. Mrs. Edgar was still there, but the Doctor was gone. I asked her where the Doctor was. She didn't answer me. She came to the cabinet where we kept the clothes and she got my coat. She said in a loud screaming voice, 'You take your things and you get out of here!' A nurse in the outside hall heard her. I took my coat and went into the next office. Later, after lunch, I went into the office again with another nurse in my company and got a parasol I had forgotten. As I went out, Mrs. Edgar said to the nurse

that I walked off the job that morning and her husband asked her to take over."

Another doctor, connected with the Wayne County General Hospital, testified:.

"I know Dr. Irving Edgar, and his wife, Mrs. Claire Edgar. I have known Dr. Edgar since about 1936, possibly 1935. I have known Mrs. Edgar, I think, since somewhere around 1938. * * * Mrs. Edgar talked to me about their marital difficulties in 1946. She called me at irregular intervals. I estimated that during the year she called me 10 to 20 times. I don't recall the exact time when she first called me in 1946, but I do know that she called me in November, and I do know she called me in October. I am not certain that she called me in September or August, but she may have. I can't remember exactly what Mrs. Edgar told me about Dr. Edgar in October because what she told me in October was essentially the same as she told me in November and December, also. There were many accusations of infidelity, accusations that he was mentally ill. She told me that if I were a friend to her and to her husband, I ought to institute commitment proceedings. She told me that he didn't discharge his duties as a husband inasmuch as he didn't provide her with funds. She told me that he was carrying on affairs with various women, that he was mistreating his patients in the office. She told me that she had investigated his office and found evidences of misbehavior, that she had read things from the scrap paper in his wastebasket, that he mistreated his children, that she believed that he did this through his own misunderstandings of things, that she attributed it to mental illness. * * * She told me that he was carrying on affairs with several women, that he was oversexed, in that he was carrying on affairs with several women at the same time. She told me that he was a coward, that he was ruining his life and her life. She told me that he was mentally ill. * * * She told me that she would wreck him professionally,

that she would ruin him socially and personally and professionally, if he persisted in his behavior, and while she was saying that, he said, 'But you wouldn't want to do that sort of thing?' That is not exactly verbatim;—'You wouldn't want to do that sort of thing because that would ruin the children.' And her statement was that he was ruining the children, and then she added these other things, that she would call up various physicians, that she would seek out his patients, and that she would give them a true understanding of his character or his weaknesses."

Another physician friend of the plaintiff testified:

"I know Dr. Edgar. I have known him about 20 years. I know Mrs. Edgar. I have known her for possibly from 10 to 15 years. I knew Dr. Edgar before his marriage. I saw him regularly at medical meetings and was up to his office occasionally. I saw him on an average of once a week up until the time of his marriage. After his marriage my visits tapered down.

"I recognized Mrs. Edgar's voice over the telephone. Mrs. Edgar saw me during the year 1945. I had a conversation with her. She stated that she thought I was procuring engagements for Dr. Edgar with various women and she was a little unreasonable about the situation. I told her that she was entirely mistaken, that that situation did not exist, that when I saw Dr. Edgar there were no women companions present. Mrs. Edgar called me again in 1946. The gist of her conversation was much the same as in 1945, only this time the conversation was much more prolonged. I told her at that time that if she wished to come down to the office I would be glad to discuss the situation with her and correct these thoughts about the matter. She did not come to my office. The accusations Mrs. Edgar made to me were not true."

There was other testimony of like effect. We hear chancery cases *de novo* and are not bound by the

conclusions reached by the trial court. The record in this case fully establishes plaintiff's allegations in his bill of complaint that the defendant has been guilty of extreme and repeated cruelty. A decree may be entered in this Court to that effect, granting a divorce to the plaintiff on that ground. The decree shall contain a paragraph substantially in conformity with Michigan Court Rule No. 51, § 6(c), as adopted by this Court, effective October 13, 1947; and also shall contain a paragraph continuing such provisions as have heretofore been made for temporary alimony or support and custody of children, attorney fees, and injunctive or other interlocutory relief, until final decree is entered or decree becomes final under said Rule.

The record here is barren of sufficient testimony as to the property of the parties, the necessities of the defendant and minor children, and the net earnings or income of the plaintiff, to afford this Court a proper basis for determining property settlement or alimony. Nor do we find sufficient proof on which to base a satisfactory decree regarding the custody of minor children. Therefore the decree entered here will provide for a remand of the case for the purpose of taking further testimony, if necessary, with directions to amplify the decree to provide for property settlement, alimony, and custody of the children; and also for enforcement of the decree by inclusion of the temporary injunction or otherwise, in the discretion of the trial court. In view of the foregoing conclusion, motions filed in this Court since the appeal was perfected do not require further consideration. No costs awarded in this Court.

BUSHNELL, C. J., and SHARPE, REID, NORTH, DETHMERS, BUTZEL, and CARR, JJ., concurred.